M3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL BOWES, et al.,                    )
                                       )
              Plaintiffs,              )
       v.                              )        CIVIL ACTION
                                       )        NO. 00-12557-NG
JOHN ASHCROFT, in his official         )
capacity as Attorney General of the    )
United States, et al.,                 )
                                       )
              Defendants.              )

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION TO DISMISS

September 19, 2001

DEIN, U.S.M.J.

### I.  INTRODUCTION

The plaintiffs, individuals who are in arrears in the payment of child support and three

non-profit organizations,[1] seek declaratory and injunctive relief in this constitutional challenge to

two provisions of the Child Support Enforcement Program of the Social Security Act.  In

particular, the plaintiffs challenge 42 U.S.C. § 666(a)(9)(C), commonly referred to as the

"Bradley Amendment," which requires as a prerequisite to the receipt of federal funds that states

provide that any child support orders not be subject to retroactive modification.  The plaintiffs

also challenge 42 U.S.C. § 652(k), and its implementing regulations found at 22 C.F.R. § 51.70

(a)(8), which provide for the denial of passports to certain individuals owing in excess of $5,000

---

[1] The individual plaintiffs are Paul Bowes, Keith Bruner, Daniel M. Crowther, Bruce
Eden, Douglas Helppi, John Scott Pethick, David M. Pollard, Earl Henry Sholley, Matthew
Schuzer, John Tyson, Ernest Valdez, and Paul Vitale.  The three non-profit corporation plaintiffs
are ANCPR, Inc., A Matter of Justice, Inc., and Men's Defense Association.



in outstanding child support ("passport provisions").  The defendants, various officials of the

United States government,[2] have moved to dismiss the amended complaint pursuant to Fed. R.

Civ. P. 12(b)(1) and (6) on the grounds that the plaintiffs lack standing to bring these claims and

for failure to state a claim upon which relief can be granted.  (See Docket #9).  For the reasons

detailed below, this court recommends to the district judge to whom this case is assigned that the

motion to dismiss be ALLOWED as the plaintiffs lack standing to maintain many of the claims

raised in this action and have failed to assert any claims upon which relief can be granted.

## II.  **STATEMENT OF FACTS**

When ruling on a motion to dismiss, the court must accept as true all well-pleaded facts,

and the plaintiff is to be given the benefit of all reasonable inferences.  See Cooperman v.

Individual Inc., 171 F.3d 43, 46 (1st Cir. 1999); Dartmouth Review v. Dartmouth Coll., 889 F.2d

13, 16 (1st Cir. 1989).  Applying this standard to the instant case, the relevant facts are as follows:

In 1975, Congress passed the Child Support Enforcement Act, Title IV, Part D of the

Social Security Act, 42 U.S.C. §§ 651-669b ("CSE Program" or "Title IV-D").  The CSE

Program was enacted to locate absent parents, establish paternity, and enforce child and spousal

support.  See 42 U.S.C. § 651.

To achieve these program goals, Title IV-D sets forth various conditions that states must

meet in order to receive federal funds for the state's child support enforcement programs and to

---

[2] John Ashcroft, in his official capacity as Attorney General of the United States, Tommy Thompson, in his official capacity as Secretary of Health and Human Services, David Gray Ross, in his official capacity as Commissioner of the Office of Child Support Enforcement, and Colin Powell, in his official capacity as Secretary of State of the United States of America.

obtain federal block grants from the Temporary Assistance to Needy Families ("TANF")

program.[3]  See 42 U.S.C. §§ 651-669b.

Plaintiffs challenge two provisions of Title IV-D.  First, the plaintiffs challenge the

Bradley Amendment, which was originally enacted in 1986.  The Bradley Amendment provides

that, as a condition to receiving federal funding, a state must have in effect laws requiring the

following:

> Procedures which require that any payment or installment of support under
> any child support order, ... is (on and after the date it is due) -
>
> (A)     a judgment by operation of law, with the full force, effect, and
>         attributes of a judgment of the State, including the ability to be
>         enforced,
> (B)     entitled as a judgment to full faith and credit in such State and in
>         any other State, and
> (C)     not subject to retroactive modification by such State or by any
>         other State;
>
> except that such procedures may permit modification with respect to any
> period during which there is pending a petition for modification, but only
> from the date that notice of such petition has been given, either directly or
> through the appropriate agent, to the obligee or (where the obligee is the
> petitioner) to the obligor.

42 U.S.C. § 666(a)(9); see also 42 U.S.C. § 654(20) (requiring that a state plan for child support

must comply with provisions of Section 666).  Thus, although participating states cannot permit

retroactive modification of child support orders, the federal guidelines continue to allow for

prospective modification of a support order, beginning as of the date a petition for modification

is filed, if the non-custodial parent's financial circumstances change and the custodial parent is

afforded notice of the petition to modify the support order.  See 42 U.S.C. § 666(a)(9).  Signifi-

---

[3] TANF replaced Aid to Families with Dependant Children ("AFDC") with the passage
of welfare reform legislation, the Personal Responsibility and Work Opportunity Reconciliation
Act of 1996 ("PRWORA").  See Pub. L. No. 104-193, 110 Stat. 2105 (1996).

cantly, the legislative history of the Bradley Amendment establishes that most states already had

in place laws prohibiting the retroactive modification of support orders at the time the federal

legislation was enacted. See S. Rep. No. 99-348, at 155; H.R. Conf. Rep. No. 99-1012, at 272,

reprinted in 1986 U.S.C.C.A.N. at 3917.

The plaintiffs also challenge the passport provisions added as part of PRWORA, now

found at 42 U.S.C. § 652(k), along with its implementing regulation, 22 C.F.R. §51.70(a)(8).

These provisions provide for the denial of passports to certain individuals owing in excess of

$5,000 in outstanding child support. The statute provides:

> (1) If the Secretary [of Health and Human Services] receives a certi-
> fication by a State agency in accordance with the requirements of
> section 654(31) of this title that an individual owes arrearages of
> child support in an amount exceeding $5,000, the Secretary shall
> transmit such certification to the Secretary of State for action (with
> respect to denial, revocation, or limitation of passports) pursuant to
> paragraph (2).
> (2) The Secretary of State shall, upon certification by the Secretary
> transmitted under paragraph (1), refuse to issue a passport to such
> individual, and may revoke, restrict, or limit a passport issued
> previously to such individual.
> (3) The Secretary and the Secretary of State shall not be liable to an
> individual for any action with respect to a certification by a State
> agency under this section.

42 U.S.C. § 652(k); see also 22 C.F.R. § 51.70(a)(8) (providing that the Secretary of State shall

not issue a passport to any individual who has been "certified by the Secretary of Health and

Human Services as notified by a State Agency under 42 U.S.C. § 652(k) to be in arrears of child

support in an amount exceeding $5,000").

The amended complaint generally alleges that the "plaintiffs include individuals faced

with support arrearage obligations and are unable to retroactively modify their arrearages due to

-4-

the [Bradley] Amendment, and who also have had their passports revoked or who are ineligible for a passport due to child support arrearages." (See Amended Complaint ("Compl.") at ¶ 2; see also id. at ¶¶ 5-16). The plaintiffs claim to have suffered many harms due to their inability to retroactively modify support orders, including the loss of driver's licenses; prosecution and imprisonment; passport revocation; being "forced to live at below poverty level"; and having "difficulties in holding a job," "maintaining a bank account" or "having any kind of meaningful access to the economy." (Id. at ¶¶ 27-28). The amended complaint also alleges that "occupational licenses" and "food stamps are suspended as a means of implementing the child support collection and enforcement scheme precipitated by operation of the Amendment." (Id. at ¶ 35; see also id. at ¶¶ 36-56, detailing the specific harms allegedly suffered by the individual plaintiffs allegedly as a result of the Bradley Amendment and the passport provisions).

It is also alleged in the amended complaint that the plaintiff, ANCPR, Inc., is a non-profit corporation "which advocates the repeal of the Bradley Amendment and whose membership consists of non-custodial parents, who are affected by the Bradley Amendment." (Id. at ¶ 17). The plaintiff, A Matter of Justice, Inc., is alleged to be a non-profit corporation whose "membership includes a number of non-custodial parents burdened by child support arrearages." (Id. at ¶ 18). The plaintiff, Men's Defense Association, is alleged to be "a non-profit corporation advocating legal interests of men in domestic relations situations." (Id. at ¶ 19).

The plaintiffs raise several constitutional challenges to the Bradley Amendment. They claim that it violates the plaintiffs' rights to substantive due process and equal protection in violation of the Fifth and Fourteenth Amendments (Counts I and III), violates state sovereignty under the Tenth Amendment (Count II), and violates the plaintiffs' "natural rights" pursuant to

the Ninth Amendment (Count IV).  The passport provisions are also alleged to violate the

plaintiffs' substantive due process rights (see Pls.' Opp. at 16) and their rights under the Ninth

Amendment (Count IV).

The government's motion seeks dismissal of the complaint contending that the plaintiffs

lack standing to bring many of their claims, including their Tenth Amendment challenge to the

Bradley Amendment.  To the extent the plaintiffs have standing, the government also contends

that the plaintiffs have failed to state claims under the Due Process and Equal Protection Clauses,

the Ninth Amendment or the Tenth Amendment.

### III.  DISCUSSION

### A.  Standing Issues

### 1.  Standing of Individual Plaintiffs

"'For purposes of ruling on a motion to dismiss for want of standing, . . . courts must

accept as true all material allegations of the complaint, and must construe the complaint in favor

of the complaining party.'"  United States v. AVX Corp., 962 F.2d 108, 114 (1st Cir. 1992)

(citations omitted).  However, a "court is obliged neither to 'credit bald assertions, periphrastic

circumlocutions, unsubstantiated conclusions, or outright vituperation, . . . nor to honor subjec-

tive characterizations, optimistic predictions, or problematic suppositions . . . .' '[E]mpirically

unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated facts,' deserve no deference." Id. at 115 (internal citations omitted).[4]

The question of standing is the threshold question in every federal case. See Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975). Article III of the Constitution restricts the jurisdiction of the federal courts only to those disputes in which there is an actual "case" or "controversy." See Raines v. Byrd, 521 U.S. 811, 818, 117 S. Ct. 2312, 2317 138 L. Ed. 2d 849 (1997), and cases cited. At issue is "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Allen v. Wright, 468 U.S. 737, 750-51, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984) (citation omitted). To meet the Article III requirements, there are three elements that the plaintiffs must satisfy:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision.

Adams v. Watson, 10 F.3d at 918 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351) (1992) (internal citations and some internal quotation

---

[4] The court in AVX also ruled that "where standing is at issue, heightened specificity is obligatory at the pleading stage." 962 F.2d at 115. However, this heightened pleading requirement has subsequently been called into question. See Adams v. Watson, 10 F.3d 915, 919 n.8 (1st Cir. 1993); Sea Shore Corp. v. Sullivan, 158 F.3d 51, 55, n.3 (1st Cir. 1998); see also Barrington Cove LP v. R.I. Housing & Mortgage Fin. Corp., 246 F.3d 1, 5 (1st Cir. 2001) (indicating that no heightened pleading requirement would be applied to substantive due process claim). In the instant case, the issue of the appropriate standard does not need to be reached and the heightened pleading requirement has not been applied since dismissal is warranted under even more liberal pleadings standards.

marks omitted); see also Becker v. Fed. Election Com'n, 230 F.3d 381, 385 (1ˢᵗ Cir.), cert. denied, 121 S. Ct. 1733 (2001), and cased cited. "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561, 112 S. Ct. at 2136.

### a. **Injury in Fact**

In passing, the government contends that the plaintiffs have failed to meet the "injury in fact" requirement for their challenge of the Bradley Amendment, since the "Amended Complaint does not allege that any plaintiff has actually sought to have a support award retroactively modified, let alone that such modification would have been granted but for the existence of the state laws prohibiting retroactive modifications." (Def. Mem. at 6, n.4). The government also argues that the plaintiffs have not sufficiently alleged an injury in fact in relation to the passport provision as the complaint does not allege that any plaintiff's passport has been denied or revoked. (Def. Mem. at 7-8). As a result, the government asserts, the challenges to the passport provisions are not ripe. (Id.) See Texas v. United States, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259, 140 L. Ed. 2d 406 (1998) ("[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (citations omitted). This court finds that the plaintiffs have satisfied the "injury in fact" pleading requirements in connection with the challenges both to the Bradley Amendment and the passport provisions.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, 'we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan, 504 U.S. at 561, 112 S. Ct. at 2137 (citation omitted); see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104, 118

S. Ct. 1003, 1017, 140 L. Ed. 2d 210 (1998).  At this early stage of the litigation, the individual

plaintiffs have asserted that they are in arrears in their child support and have been harmed by the

Bradley Amendment.[5]  (See Compl. at ¶¶ 2, 5-16, 25-30).  In addition to general allegations of

harm, specifics have been given with respect to certain plaintiffs.  (E.g., Compl. at ¶¶ 37-55).  As

to the injuries suffered by the plaintiffs as a result of the passport provisions, there are allegations

that some plaintiffs have had their passports revoked or have been unable to obtain a passport.

(See Compl. at  ¶¶ 2, 14, 27).  There are also allegations that the plaintiffs have become ineligible

for a passport or have been notified that their passport may be suspended.  (See id. at ¶¶ 38, 40,

45, 47, 56).  These allegations are sufficient at the initial pleading stage.

Furthermore, under the statutory framework, if an individual owes arrearages of child

support in excess of $5,000, the participating state must notify the Secretary of Health and

Human Services who must then transmit this information to the Secretary of State.  See 42

U.S.C. §§ 652(k) and 654(31);[6] 22 C.F.R. 51.70(a)(8).  At this point the Secretary of State must

refuse to issue passports to said individuals and may revoke, restrict or limit a passport already

issued.  Id.  To the extent a plaintiff's support arrearages are in excess of $5,000, the claim no

longer hinges on a contingent future event.  Therefore, the controversy is ripe for adjudication.

See Riva v. Massachusetts, 61 F.3d 1003, 1009-1012 (1st Cir. 1995) (action for declaratory

---

[5]  Although as noted infra, the court has concerns as to whether the harms allegedly
suffered by the plaintiffs were actually caused by the Bradley Amendment.

[6]  42 U.S.C. § 654 (31) requires each state to establish a procedure for certifying to the
Secretary of Health and Human Services determinations that individuals owe arrearages in excess
of $5,000, under which "each individual concerned is afforded notice of such determinations as
the consequences thereof, and an opportunity to contest the determination."

judgment was ripe even though challenged modification of benefits was not scheduled for several years: no uncertainty regarding statute's application).

For these reasons, the individual plaintiffs have satisfied the "injury in fact" pleading requirements. Since the government does not challenge the plaintiffs' ability to meet the causation and redressability requirements of standing in relation to the plaintiffs' challenge to the passport provisions, this court finds that the plaintiffs have standing to assert those claims.

### b.  Causation

The government contends that the plaintiffs cannot meet the causation requirement to have standing to raise their challenges to the Bradley Amendment because the injuries of which the plaintiffs complain, the inability to retroactively modify their child support obligations, is caused by the laws of the states in which such obligations were incurred, and not by the Bradley Amendment. This argument is persuasive.

A court can "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 41-42, 96 S. Ct. 1917, 1926, 48 L. Ed. 2d 450 (1976); see also Lujan, 504 U.S. at 562, 112 S. Ct. at 2137. The third parties in this case are the various states that have enacted the non-modification laws to which the plaintiffs object. Obviously, for the large number (in fact a majority) of states that already had in place laws prohibiting retroactive modification of support orders prior to the Bradley Amendment, the cause of the alleged harms suffered by the plaintiffs cannot be attributed to the Amendment. Thus, there is no "causation" to grant the plaintiffs standing.

The plaintiffs do not distinguish between the states which had the restrictions before the

Bradley Amendment and those which did not. Moreover, the plaintiffs do not assert that there

are states which enacted laws prohibiting the retroactive modification of support orders solely in

order to comply with the Bradley Amendment. Even assuming that there are such states,

however, the appropriate defendants in a suit by the individual plaintiffs would be such states.

The federal legislation does not in and of itself prohibit the retroactive modification of child

support awards. Rather, it merely requires states to pass and enforce such laws if they wish to

participate in the Title IV-D and TANF programs. See Kansas v. United States, 214 F.3d 1196,

1198, 1203 (10th Cir.), cert. denied, 531 U.S. 1035 (2000) (holding that "states are not required

to participate in the Title IV-D program" and that if a state "finds the IV-D requirements so

disagreeable, it is ultimately free to reject both the conditions and the funding, no matter how

hard that choice might be"). Thus, it is the state laws, if anything, which are causing the

plaintiffs harm, and the states should be the parties sued. See Simon, 426 U.S. at 41-43, 96 S.

Ct. at 1925-27 (no standing to challenge IRS ruling on hospitals' tax status because no showing

that ruling caused hospitals to decline to provide medical services, which was the basis of the

plaintiffs' injury); Am. Canoe Ass'n, Inc. v. EPA, 30 F. Supp. 2d 908, 915 (E.D. Va. 1998) (no

standing to challenge EPA grant to Virginia under Clean Water Act ("CWA") despite state's

failure to comply with EPA regulations, where there was no allegation that "Virginia has failed to

create water-quality monitoring systems *because* it has received CWA grants from EPA")

(emphasis in original). See also Lujan, 504 U.S. at 571, 112 S. Ct. at 2142 (no standing where "it

is entirely conjectural whether the nonagency activity that affects respondents will be altered or affected by the agency activity they seek to achieve.").[7]

If a state objected to the provisions of the CSE and TANF programs, the state, itself, could bring suit against the federal government. See Hodges v. Shalala, 121 F. Supp. 2d 854, 864-65 (D.S.C. 2000) (state had standing to bring action for declaratory relief against Secretary of Health and Human Services with respect to state's inability to meet conditions imposed by CSE program upon its acceptance of federal funds under the TANF program); Kansas v. United States, 24 F. Supp. 2d 1192, 1195 (D. Kan. 1998), aff'd, 214 F.3d 1196 (10th Cir.), cert. denied, 531 U.S. 1035 (2000) (state had standing to raise Tenth Amendment challenge to provisions of the PRWORA after finding that the loss of funds and other costs of complying with PRWORA were traceable to federal mandates even though state voluntarily agreed to participate in the program). This would be an especially appropriate process here since many states enacted the challenged provisions separate and apart from the Bradley Amendment. Thus, it is imperative to have the states' position clarified in this dispute.

---

[7] This court recognizes that in Childrens & Parents Rights Ass'n v. Sullivan, 787 F. Supp. 724, 729-31 (N.D. Ohio 1991) (hereinafter "CAPRA"), the court held that an association of non-custodial fathers had standing to maintain action against the Department of Health and Human Services when challenging Title IV-D child support regulations, but did not have standing to pursue an action against the state agency which promulgated regulations to conform with federal law. In that case, however, it was clear that the state's regulations were enacted in response to the Title IV-D mandate, unlike the instant case where the majority of states had the challenged non-modification provision prior to the enactment of the federal regulations. See id. at 732 ("It is federal statutes and regulations that have required the contested procedures, if federal statutes and regulations were unconstitutional, Plaintiffs would gain relief from the [federally mandated] use of specific and numeric rebuttable presumptions in calculating child support awards."). Moreover, while granting plaintiffs standing, the CAPRA court upheld the challenged regulations on the merits. Id. at 737 (allowing HHS' motion for summary judgment on all claims but one; CAPRA v. Sullivan, 787 F. Supp. 738 (N.D. Ohio 1992), allowing HHS's motion with respect to the final claims).

Finally, it is clear from the face of the complaint that most, if not all, of the injuries the plaintiffs have allegedly suffered cannot be directly traced to the laws preventing retroactive modification of support orders. In particular, many of the harms allegedly suffered by the plaintiffs, such as the loss of driver's licenses, garnishment of wages and "prosecution and imprisonment" are mandated by other state enforcement provisions adopted under the PRWORA or other child support enforcement mechanisms, none of which are expressly linked to the Bradley Amendment. See generally 42 U.S.C. § 666(a)(16) (mandating that states which participate in the CSE program institute procedures permitting the suspension or restriction of driver and occupational licences of individuals with child support arrearages); 42 U.S.C. § 666(a)(1)(A) (mandating procedures for the withholding from income amounts payable as support); 18 U.S.C. § 228 (making the evasion of child support a federal crime). These statutes are not the basis of the plaintiffs' lawsuit. Rather, the plaintiffs' amended complaint specifically identifies the Bradley Amendment, 42 U.S.C. § 666(a)(9)(C), and the passport provisions, 42 U.S.C. § 652(k) and 22 C.F.R. § 51.70(a)(8), as the only statutes and regulations at issue. (See, e.g., Compl. at ¶¶ 1-3, 70).

For these reasons, in connection with their challenge to the Bradley Amendment, the individual plaintiffs have not satisfied the requirement that there be a causal connection between the alleged injury and the challenged conduct.

### c. **Redressability**

For the same reasons that causation is lacking, the plaintiffs cannot meet the redress-ability requirement in their challenge to the Bradley Amendment and the federal court is at a loss to provide the plaintiffs with relief. See Steel Co., 523 U.S. at 107, 118 S. Ct. at 1019 ("Relief

that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement").

The plaintiffs have the burden of demonstrating that prospective relief will eliminate the harm allegedly suffered. See Simon, 426 U.S. at 44-45, 96 S. Ct. at 1927. In this case, redressability rests on an indirect chain of events. Even if this court declared the Bradley Amendment to be unconstitutional, it is "purely speculative" that the various states participating in the CSE and TANF programs would repeal their laws prohibiting retroactive modification of support awards. See id. at 45-46, 96 S. Ct. at 1927-28 ("the complaint suggests no substantial likelihood that victory in this suit would result in respondents receiving the hospital treatment they desire"); see also Sea Shore Corp., 158 F.3d at 58 (after state declined to appeal the invalidation of state law pertaining to liquor price postings, intervener trade association lacked standing to appeal given absence of indication that the state would enforce the posting requirements if the lower court ruling was reversed); Biszko v. RIHT Fin. Corp., 758 F.2d 769, 772-73 (1st Cir. 1985) (where declaring statute unconstitutional would not provide relief plaintiffs desire, and plaintiffs' case is premised on possible response by legislature to ruling of unconstitutionality, plaintiffs' "injury is not merely speculative — it is positively chimerical.") As noted above, most states already had in place laws prohibiting the retroactive modification of support orders. This fact, combined with the fact that many of the harms complained of are the result of regulations which are not being challenged in this litigation, leads to the conclusion that a ruling in plaintiffs' favor in this litigation will not provide them with relief from the harms they have allegedly suffered.

In sum, the plaintiffs have failed to establish that there is a causal connection between their injuries and the conduct complained of, or that their injuries are likely to be redressed by a

favorable decision. As a result they lack standing to maintain their challenge to the Bradley Amendment.

## 2. **Organizational Standing**

The government has not specifically challenged the standing of the plaintiff organizations, but rather has taken the position that if the individual plaintiffs have standing then the organizations have standing. However, given the Supreme Court's emphasis on requiring strict compliance with jurisdictional standing, see Steel Co., 523 U.S. at 101-02, 118 S. Ct. at 1016, this court notes its concerns regarding the plaintiff organizations' standing to participate in this action.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000); see also Town of Norwood v. Fed. Energy Regulatory Com'n, 202 F.3d 392, 405-406 (1st Cir.), cert. denied, 531 U.S. 818 (2000) ("an association or similar representative organization may have standing if at least one of its members has standing in his or her own right, the interests served by the suit are pertinent to the mission of the organization, and relief does not require the presence of the members in the suit"). An association that satisfies these requirements can proceed "even in the absence of injury to itself." Warth, 422 U.S. at 511, 95 S. Ct. at 2211. However, "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." Simon, 426 U.S. at 40, 96 S. Ct. at 1925.

As an initial matter, absent from the complaint are any allegations that any of the individual plaintiffs are members of the plaintiff organizations. Moreover, although the organizations may have an interest in the repeal of the Bradley Amendment, the allegations in the amended complaint are insufficient for this court to infer that any one of the organizations' members would have standing to sue in his own right. ANCPR, Inc. describes its membership as consisting of "non-custodial parents, who are affected by the Bradley Amendment." (Compl. at ¶ 17). What the effects of the Amendment are on such parents remain undefined. A Matter of Justice, Inc.'s relationship to the issues in this case are even more tenuous. "Its membership includes a number of non-custodial parents burdened by child support arrearages." (Compl. at ¶ 18). There is no link supplied between the burden and the challenged laws. Finally, the allegations that plaintiff Men's Defense Association advocates for "the legal interests of men in domestic relations situations" is not sufficient to overcome the requirement that the interests at stake in this litigation be germane to the organization's purpose. Thus, while this issue does not have to be reached given the other rulings in this case, it seems on the present record that the plaintiff organizations do not have standing to proceed with any claim.

### 3.  Tenth Amendment Standing

Assuming that the plaintiffs are found to have standing to challenge the Bradley Amendment, the defendants contend that the plaintiffs lack standing to assert a Tenth Amendment violation. Such a claim, according to the government, would have to be raised by the states or their representatives. There is a split of authority among the jurisdictions on this issue. See generally A. Gershengorn, Private Party Standing To Raise Tenth Amendment Commandeering

Challenges, 100 Colum. L. Rev. 1065 (May 2000).[8]  It is an open question in this jurisdiction.
For the reasons detailed herein, this court agrees that the plaintiffs lack standing to raise the
Tenth Amendment claim.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by
the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to
the people." U.S. Const. Amend. X.  In Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S.
118, 144, 59 S. Ct. 366, 372-73, 83 L. Ed. 2d 543 (1939), the Supreme Court ruled that the
individual appellants, "absent the states or their officers, have no standing in this suit to raise any
question under the [Tenth] Amendment."  This decision has never been overruled and "remains
binding authority." Gaubert v. Denton, No. 98-2947, 1999 WL 350103, at *5 (E.D.La. 1999),
aff'd without decision, 210 F.3d 368 (5th Cir. 2000) (relying on Tennessee Electric court rules
that individuals lack standing to raise Tenth Amendment challenge to federal evidentiary
privileges, although they may raise First Amendment and due process claims).  The rationale is
that "the Tenth Amendment protects only States, not private parties" so that only the states or
"those arms of state or local government with delegated State sovereign powers have been
approved as claimants." Vt. Assembly of Home Health Agencies, Inc. v. Shalala, 18 F. Supp. 2d
355, 370-71 (D. Vt. 1998), and authorities cited (private organization lacks standing to raise

---

[8] The author describes the positions taken by the federal courts as being divided into
three broad categories as follows: "Courts generally have recognized that a political subdivision
of a state has standing to raise a Tenth Amendment claim.  At that point, however, some courts
have drawn the line, ruling that private plaintiffs not affiliated with the government may not raise
such a challenge.  Other courts have extended standing to private plaintiffs begrudgingly, or have
assumed such standing while questioning whether it constitutionally can exist.  A third set has
affirmatively recognized that private parties have standing to raise these claims." 100 Colum. L.
Rev. at 1067 (citations omitted).

Tenth Amendment challenge to federal Medicare reimbursement rules). <u>See also</u> <u>Mountain States Legal Found. v. Costle</u>, 630 F.2d 754, 761, 771 (10th Cir. 1980), <u>cert. denied</u>, 450 U.S. 1050, 101 S.Ct. 1770, 68 L. Ed. 2d 246 (1981) (State of Colorado was the real party in interest in case involving EPA's decision conditionally approving portions of state's air quality control implementation plan, and where plaintiffs took position antithetical to state's position, they lacked standing to pursue Tenth Amendment claims.)

A conclusion that the plaintiffs lack standing is particularly appropriate in this case. To the extent that the plaintiffs purport to assert the "state's rights," a majority of states have enacted anti-modification provisions on their own, thereby indicating that their position on the Bradley Amendment is inconsistent with that advanced by the plaintiffs. Perhaps even more significantly, the "harm" the plaintiffs claim to have suffered is not based on the Tenth Amendment protection afforded states from improper interference with their functioning. Rather, they are personal injuries unrelated to the Tenth Amendment. <u>See</u> <u>Vt. Assembly of Home Health Agencies, Inc.</u>, 18 F. Supp. 2d at 371 (where plaintiffs "do not allege an imposition on any delegated sovereign powers," any of their injuries "is a by-product, not a direct result, of a Tenth Amendment concern" and the State of Vermont had not joined in the lawsuit, no standing to raise Tenth Amendment challenge to Medicare regulations).

Plaintiffs rely on <u>Gillespie v. City of Indianapolis</u>, 185 F.3d 693 (7th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1116, 120 S.Ct. 934, 145 L. Ed. 813 (2000), where, despite a contrary position asserted by the state and local governments whose Tenth Amendment rights were being advocated, an individual was found to have standing to assert a Tenth Amendment challenge to a provision of the federal Gun Control Act of 1968. <u>Id.</u> at 700-01. <u>See generally</u> <u>id.</u> at 700, n.3

(collecting cases which address the issue of standing, and concluding that the "difference of

opinion among the lower courts exposes the unsettled nature of the issue"). There, the plaintiff

Gillespie lost his job as a police officer due to an amendment to the Gun Control Act which

prohibited persons convicted of domestic violence offenses (of which he was one) from

possessing firearms. The court initially found that Gillespie met the general standing

requirements in that he had suffered a "distinct and palpable injury," there was a "causal

connection between the claimed injury and the challenged conduct," and the court was "able to

redress the plaintiff's injuries through the exercise of its remedial powers." Id. at 701. It went on

to accurately describe the additional analysis under the Tenth Amendment as follows:

> In pragmatic terms, [Gillespie's] standing is ... easy to appreciate. The
> theoretical nexus between his injury and any violation of the Tenth
> Amendment, however, is less clear. Yes, Gillespie is constrained by the
> statute, but is he really injured by any Tenth Amendment violation
> reflected in that statute? The Tenth Amendment protects the sovereignty
> of the States, and Gillespie's individual ability to carry a gun has nothing
> to do with Indiana's status as a sovereign. True enough, before Congress
> stepped in, Indiana had not chosen to bar those convicted of domestic
> violence from possessing guns, and indeed it might never have elected to
> do so. But it could have done so, and in that event, Gillespie would be in
> the very same situation he finds himself today. Any injury to him by
> virtue of a Tenth Amendment violation is in this way incidental; it is really
> the State's ox being gored.

Id. Having so stated the issue, the court then continued its analysis in such a manner as to

completely vitiate the significance of the Tenth Amendment. Thus, the court first concluded that

there did not have to be "a logical nexus between the plaintiff's injury and the nature of the

constitutional right he asserts," relying on Duke Power Co. v. Carolina Envtl. Study Group, Inc.,

438 U.S. 59, 72-73, 98 S. Ct. 2620, 2630, 57 L. Ed. 2d 595 (1978). Gillespie, 185 F.3d at

701-02. However, Duke Power did not involve a Tenth Amendment claim, and the Duke Power

-19-

court recognized that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy requirement,' this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." 438 U.S. at 80, 98 S. Ct. at 2634 (internal citations omitted). Recognizing that this limitation would normally preclude a private individual from asserting the rights of a state, the Gillespie court then cited the case of New York v. United States, 505 U.S. 114, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992), for the proposition that "the Tenth Amendment, although nominally protecting state sovereignty, ultimately secures the rights of individuals." Gillespie, 185 F.3d at 703. Consequently, according to the Gillespie court, Gillespie had "standing to raise the Tenth Amendment violation notwithstanding what state or local officials themselves may have to say about the propriety of the statute." Id. at 703-04.

New York did not involve the issue of standing. In that case, the State of New York and two of its counties sued the United States seeking a declaration that laws enacted by the federal government, which included "incentives" for the states to provide for the disposal of radioactive waste within their borders, violated the Tenth Amendment. The Court held that "while Congress has substantial power under the Constitution to encourage the States to provide for the disposal of the radioactive waste generated within its borders, the Constitution does not confer upon Congress the ability simply to compel the States to do so." 505 U.S. at 149, 112 S. Ct. at 2414. Thus, the New York case raised the classic Tenth Amendment issue, "the proper division of authority between the Federal Government and the States." Id. There is nothing in the New York decision which suggests that anyone other than the state is the appropriate party to raise that issue.

In its opinion, the Supreme Court addressed the fact that representatives from the State of New York had testified in Congress in favor of the law which was now being challenged and the State's Senator had supported it. Thus, the issue presented was "[h]ow can a federal statute be found an unconstitutional infringement of state sovereignty when state officials consented to the statute's enactment?" Id. at 181, 112 S. Ct. at 2431. In answering this question, the Court used the language on which the Gillespie court relied: "The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." Id. (emphasis added). As a result, state officials could not bargain away the constitutional limits on the division of power. Id. at 181-82, 112 S. Ct. at 2431. There is nothing in this language or the Supreme Court's decision which reinterprets the Tenth Amendment as being anything other than a safeguard of state sovereignty and rights, or which grants private individuals standing in cases raising the separation of power issues. In this court's opinion, the Gillespie court reads more into New York than exists.

The Tenth Amendment claims the plaintiffs are seeking to raise are traditional claims of whether the federal law infringes on the sovereign rights of the states. The injuries about which the plaintiffs complain do not arise because of any improper usurpation of power. Many states do not object to the anti-modification provision of the Bradley Amendment and no states have stepped forward to join the plaintiffs in this action. Under such circumstances, assuming arguendo that the issue needs to be reached, this court recommends that plaintiffs' Tenth Amendment claims be dismissed for lack of plaintiffs' standing.

## B.  The Sufficiency of the Claims Asserted

Even if the plaintiffs have standing to challenge both the Bradley Amendment and the

passport provisions, the plaintiffs have nonetheless failed to state a claim.  For this additional

reason, the motion to dismiss should be allowed.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleadings.  Thus,

when confronted with a motion to dismiss the court accepts as true all well-pleaded factual

averments and draws all reasonable inferences in the plaintiff's favor.  See Dartmouth Review,

889 F.2d at 16.  "Dismissal under Fed. R. Civ. P. 12(b)(6) is only appropriate if the complaint, so

viewed, presents no set of facts justifying recovery."  Cooperman, 171 F.3d at 46; see also

Conley v. Gibson, 355 U.S. 41, 45-48, 78 S. Ct. 99, 101-103, 2 L. Ed. 2d 80 (1957).

### 1.  Substantive Due Process

In Count I of the complaint, plaintiffs generally allege that the Bradley Amendment

violates their rights to substantive due process in violation of the Fifth and Fourteenth

Amendments of the Constitution.[9]  (See Compl. at ¶¶ 3, 59).  The government argues that the

plaintiffs have failed to state a due process claim and moves for dismissal of this count.  For the

reasons detailed herein, the motion to dismiss Count I should be allowed.

In order to prevail against a motion to dismiss a substantive due process claim under Rule

12(b)(6), the complaint must allege either that the plaintiffs suffered a deprivation of an identi-

fied liberty or property interest protected by the due process clause, or that the government's

conduct "was so egregious as to 'shock the conscience.'"  Barrington Cove LP, 246 F.3d at 5

(quoting Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 622 (1st Cir. 2000) (citations omitted))

---

[9]  The plaintiffs have not advanced any procedural due process claims.

("There are two theories under which a plaintiff may being a substantive due process claim.
Under the first, a plaintiff must demonstrate a deprivation of an identified liberty or property
interest protected by the Fourteenth Amendment.  Under the second, a plaintiff is not required to
prove the deprivation of a specific liberty or property interest, but, rather, he must prove that the
state's conduct 'shocks the conscience.'").  See also County of Sacramento v. Lewis, 523 U.S.
833, 847, n.8, 118 S. Ct. 1708, 1717, 140 L. Ed. 2d 1043 (1998) (explaining the different tests
applied to substantive due process challenges to legislative actions as opposed to challenges to
executive actions); Herrera-Inirio v. Immigration & Naturalization Serv., 208 F.3d 299, 309 (1st
Cir. 2000) ("shock the conscience" analysis generally applicable only to executive action).  The
complaint does not satisfy either of these alternatives.

### a.  Fundamental Interests

"[T]he Due Process Clause specially protects those fundamental rights and liberties which
are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept
of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'"
Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 2268, 138 L. Ed. 2d 772
(1997) (citations and internal quotations omitted).  If the government has infringed upon a
fundamental liberty interest, the infringement must be "narrowly tailored to serve a compelling
state interest." Reno v. Flores, 507 U.S. 292, 301-02, 113 S. Ct. 1439, 1447, 123 L. Ed. 2d 1
(1993), and cases cited.  Where, however, "the right asserted is not a fundamental one," the law
"need only be rationally related to a legitimate governmental interest in order to survive judicial
perscrutation . . . .  This is pretty much the same as saying that there must have been a 'facially

-23-

legitimate and bona fide reason' underlying the enactment of the statute." Herrera-Inirio, 208 F.3d at 308 (citations omitted).

The Supreme Court "has always been reluctant to expand the boundaries of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992). Consequently, "in substantive due process cases a 'careful description' of the asserted fundamental liberty interest" is required. Glucksberg, 521 U.S. at 721, 117 S. Ct. at 2268 (citations omitted). Thus, this court's attention must focus on "the allegations in the complaint to determine how [plaintiffs] describe[] the constitutional rights at stake and what the . . . [government] allegedly did to deprive the . . . [plaintiffs] of that right." Collins, 503 U.S. at 125, 112 S. Ct. at 1068.

### Bradley Amendment

In the instant case, plaintiffs have failed to clearly articulate the fundamental rights they claim have been violated. The amended complaint centers and is premised on the allegation that the Bradley Amendment "operates to prevent non-custodial parents from ever reaching a point in which they can satisfy the obligation imposed on them by the state court in which they have been made an obligor." (Compl. at ¶ 29). As a result of the inability to retroactively modify support orders and eliminate accumulated arrearages, the plaintiffs claim to have suffered from various secondary harms, such as job loss, loss of licenses and the like. However, plaintiffs cite no cases and none have been found even remotely suggesting that the ability to retroactively modify support orders is a fundamental right. "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it; the alleged right certainly cannot be considered

-24-

'so rooted in the traditions and conscience of our people as to be ranked fundamental.'" <u>Flores</u>, 507 U.S. at 303, 113 S. Ct. at 1447 (citations omitted).

The Bradley Amendment merely imposes the obligation to seek judicial approval for the modification of support orders. An order can be modified "retroactive" to the date of filing a motion for modification. While the consequences of failing to seek court approval before unilaterally electing not to comply with support orders may be significant, there is simply no direct infringement on any fundamental right. No one has the "fundamental right" to not pay support orders.

This conclusion is inescapable when the present case is compared with other situations where there were infringements on rights closely related to fundamental rights, yet the courts still refused to find due process violations. <u>See, e.g.</u>, <u>Valdivieso Ortiz v. Burgos</u>, 807 F.2d 6, 8 (1st Cir. 1986) (stepfather and siblings have no constitutionally protected interest in the companion-ship of their adult son and brother, and cannot maintain § 1983 action arising out of his beating death by prison guards; "the Supreme Court has protected the parent only when the government directly acts to sever or otherwise affect his or her legal relationship with a child. The Court has never held that governmental action that affects the parental relationship only incidentally — as in this case — is susceptible to challenge for a violation of due process."). <u>See also</u> <u>Lyng v. Castillo</u>, 477 U.S. 635, 638, 106 S. Ct. 2727, 2729, 91 L. Ed. 2d 527 (1986) (where "living arrangement" definition governing eligibility for and allotment of food stamps does not "directly and substantially" interfere with family living arrangements, there is no burden on a fundamental right); <u>Thompson v. Ellenbecker</u>, 935 F. Supp. 1037, 1040 (D.S.D. 1995) (deprivation of driver's

license for failure to pay child support does not infringe on a fundamental right).  In the present

case, any relationship to any (undefined) fundamental right is even more remote.

Without a fundamental right at issue, the Bradley Amendment easily satisfies rational

basis scrutiny.  The legislative history of the Bradley Amendment indicates that it was intended

to prevent the "purposeful noncompliance [with a support order] by a non-custodial parent,

because of his hope that his support obligations will be retroactively forgiven."  S. Rep. No.

99-348, at 155.[10]  Moreover, the costs of non-compliance with child support orders and the

ability to retroactively modify these orders is related to a custodial parent's need to obtain

welfare assistance.  See Kansas, 214 F.3d at 1200 (discussing the relationship between child

support enforcement and the TANF program).  As such, the Bradley Amendment is rationally

related to a legitimate government interest and does not violate the plaintiffs' rights to

substantive due process.

---

[10]  The comments of Senator Bradley also highlight the problems this legislation was designed to address:

> What often happens is that the noncustodial parent, for a variety of reasons, moves to another state.  At that point, child support enforcement efforts too frequently confront serious problems.  The noncustodial parent frequently ceases to pay child support and a large debt accrues.  Soon the debt is out of hand and the noncustodial parent seeks relief from this debt.  Under current law, a number of States permit this debt to be retroactively modified.  The custodial parent may know nothing about the modification until notified that the child will not be receiving the child support moneys that were expected and legally due.

132 Cong. Rec. S5303-04 (May 5, 1986).

**Passport Provisions**

Although not clear from the complaint, it seems that the plaintiffs are also contending that the passport provisions violate their substantive due process rights. (See Pls.' Opp. at 16). This argument, too, must fail.

The Supreme Court has recognized that the freedom to travel "is, indeed, an important aspect of the citizen's liberty" guaranteed in the due process clause of the Fifth Amendment. Kent v. Dulles, 357 U.S. 116, 127, 78 S. Ct. 1113, 1119, 2 L. Ed. 2d 1204 (1958) (Congress may order that passports be withheld on grounds related to citizenship or allegiance, or to criminal or unlawful conduct). See also Aptheker v. Secretary of State, 378 U.S. 500, 507, 84 S. Ct. 1659, 1664, 12 L. Ed. 2d 992 (1964) (recognizing that denial of a passport "is a severe restriction upon, and in effect a prohibition against, world-wide foreign travel"). "However, the fact that a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited." Zemel v. Rusk, 381 U.S. 1, 14, 85 S. Ct. 1271, 1279, 14 L. Ed. 2d 179 (1965).

There is a "crucial difference between the freedom to travel internationally and the right of interstate travel." Califano v. Aznavorian, 439 U.S. 170, 176, 99 S. Ct. 471, 475, 58 L. Ed. 2d 435 (1978) (upholding provision of Social Security Act denying SSI benefits for any month recipient is outside United States against claim it impermissibly infringes on the right to travel). The "constitutional right of interstate travel is virtually unqualified" while the right of international travel is "considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment" and can, therefore, "be regulated within the bounds of due process." Id. and cases cited. See also Haig v. Agee, 453 U.S. 280, 306, 101 S. Ct. 2766, 2781, 69 L. Ed. 2d 640 (1981) ("The Court has made it plain that the freedom to travel outside

-27-

the United States must be distinguished from the right to travel within the United States."
(emphasis in original)).  Here, the plaintiffs' challenge relates only to freedom to travel abroad,
and therefore "is not to be judged by the same standard applies to laws that penalize the right of
interstate travel."  Califano, 439 U.S. at 176-77, 99 S. Ct. at 475, and cases cited.

    Plaintiffs do not deny that they have been given the right to notice and an opportunity to
be heard under the passport provisions, and they make no procedural due process claims.  See
Weinstein v. Albright, __ F.3d __, 2001 WL 897435 at *7 (2d Cir. Aug. 10, 2001) (finding that
the statutes and regulations allowing for passport revocation due to child support arrearages
comport with procedural due process).

    This court finds that the restrictions imposed are reasonable and within the bounds of
substantive due process.  See Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1439 (9th
Cir. 1996), and cases cited ("Given the lesser importance of this freedom to travel abroad, the
Government need only advance a rational, or at most an important, reason for imposing the
ban.").  The decision in Weinstein v. Albright, No. 00CV.1193, 2000 WL 1154310, at * 5-6
(S.D.N.Y. Aug. 14, 2000), aff'd by Weinstein, 2001 WL 897435 (2d Cir. Aug. 10, 2001), is
persuasive.  There, the district court upheld the same passport provisions as those at issue in this
case against a substantive due process claim.  As the court held:

> The law and regulations at issue do not violate the Fifth Amendment as
> long as there is a rational basis for refusing to issue a passport and
> revoking a previously issued one to individuals who owe arrearages of
> child support in an amount exceeding $5,000. The Government has a
> substantial interest in promoting the payment of child support arrearages.
> Restricting passports for persons who owe substantial arrearages is
> reasonably related to furthering that end because it encourages people to
> pay such arrearages, and prevents them from fleeing the country to avoid

paying such arrearages. Therefore, there is no basis for the plaintiff's substantive due process claim.

Id. at *6. See also Eunique v. Albright, CV98-7787-GHK (SHx), slip op. at 5-8 (C.D. Cal. 1999) (unpublished decision attached to Defs.' Mem. as Ex. C) (substantive due process challenge to passport provisions dismissed, rational basis standard applied). The same results should be reached here.

### b.  Conscience-Shocking Behavior

Finally, and assuming arguendo, that the "shock the conscience" standard applies,[11] the substantive due process challenge should still be dismissed.

Few government actions have been found to be "conscience shocking." See Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999) (noting that the few cases that found or posited liability under the shocking the conscience standard involved egregious facts). Government action "shocks the conscience" only if it is "arbitrary and capricious," "runs counter to 'the concept of ordered liberty' or 'violates universal standards of decency.'" Barrington Cove LP, 246 F.3d at 7 (quoting Cruz-Erazo, 212 F.3d at 622). Usually only physically intrusive or violent conduct, or conduct that "strike[s] at the basic fabric of any protected relationship" will meet the test. Cruz-Erazo, 212 F.3d at 623. This type of conduct is not present here. Although the Bradley Amendment undoubtably has an economic impact on non-custodial parents with support obligation arrearages, the legislation permits prospective modification of support orders. As detailed above, the Amendment bears a rational relationship to the goal of child support

---

[11] This court does not need to reach the issue whether this standard applies only to executive acts, since the conduct complained of does not shock the conscience.

enforcement.  Any application of the Bradley Amendment cannot be considered "conscience shocking."

There is also an absence of "conscience shocking" behavior in relation to the application of the passport provisions.  Again, denying issuance of or revoking passports is not normally the type of egregious behavior which would satisfy the applicable standard.  See Califano, 439 U.S. at 177, 99 S. Ct. at 475 ("Unless the limitation imposed by Congress is wholly irrational, it is constitutional in spite of its incidental effect on international travel.").  Moreover, adequate procedures are in place to protect passport applicants or passport holders from arbitrary government action by way of the appeal process granted to individuals.  See 42 U.S.C. § 654(31).

Because the plaintiffs have failed to allege infringement of a fundamental liberty interest and have failed to establish that either the Bradley Amendment or the passport provisions "shock the conscience," the plaintiffs have failed to state a substantive due process claim.  See Barrington Cove LP, 246 F.3d at 5.  Accordingly, this court recommends dismissal of Count I of the amended complaint.

### 2.  Tenth Amendment

Assuming, arguendo, that the plaintiffs have standing to raise a Tenth Amendment challenge to the Bradley Amendment, this court finds that the Bradley Amendment does not violate the Tenth Amendment.  Therefore, Count II of the amended complaint should be dismissed.

The plaintiffs rely on a series of cases decided under the Commerce Clause of the U.S. Constitution to conclude that in enacting the Bradley Amendment Congress exceeded its powers. See Pls.' Opp. at 5.  For example, in United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624, 131

L. Ed. 2d 626 (1995), the Supreme Court declared that the Gun Free School Zones Act of 1990

exceeded Congress' power under the Commerce Clause.  In United States v. Morrison, 529 U.S.

598, 120 S. Ct. 1740, 146 L.Ed. 2d 658 (2000), the Supreme Court struck down part of the

Violence Against Women Act of 1994, rejecting the government's argument that the Commerce

Clause granted the federal government authority to regulate non-economic, violent criminal

conduct based on the conduct's aggregate effect on interstate commerce.  Id., 120 S. Ct. at 1754.

See also United States v. King, No. S100CR.653 (RWS), 2001 WL 111278, at *5 (S.D.N.Y.

February 8, 2001) (finding criminal provisions for failure to pay child support exceed Congress'

authority under Commerce Clause).  In these cases, the federal government was found to be

intruding on areas traditionally regulated by the states, such as family law.  Morrison, 120 S. Ct.

at 1753.  As the Supreme Court stated, in language cited by the plaintiffs, "Petitioners' reasoning,

moreover, will not limit Congress to regulating violence but may, as we suggested in Lopez, be

applied equally as well to family law and other areas of traditional state regulation since the

aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly

significant."  Id. at 1753.

    These cases are inapposite here.  The Bradley Amendment was enacted pursuant to the

Spending Clause,[12] and "the power of Congress to authorize expenditure of public moneys for

public purpose is not limited by the direct grants of legislative power found in the Constitution."

United States v. Butler, 297 U.S. 1, 66, 56 S. Ct. 312, 319, 80 L. Ed. 477 (1936), quoted in South

---

[12] Pursuant to the Spending Clause of the Constitution, Congress is empowered to "lay
and collect Taxes, Duties, Imposes and Excises, to pay the Debts and provide for the common
Defence and general Welfare of the United States."  Art. I, § 8, cl. 1.

Dakota v. Dole, 483 U.S. 203, 207, 107 S. Ct. 2793, 2796, 97 L. Ed. 2d 171 (1987); Minnesota v.

United States, 102 F. Supp. 2d 1115, 1123 (D. Minn. 2000) (U.S. v. Lopez not applicable to case

involving Congress' authority under the Spending Clause to require states to adopt certain

programs before qualifying for federal Medicare funds). Rather, pursuant to its spending powers,

"Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the

power 'to further broad policy objectives by conditioning receipt of federal moneys upon

compliance by the recipient with federal statutory and administrative directives.'" Fullilove v.

Klutznick, 448 U.S. 448, 474, 100 S. Ct. 2758, 2772, 65 L. Ed. 2d 902 (1980) (opinion of

Burger, C.J.), quoted in South Dakota, 482 U.S. at 206, 107 S.Ct. at 2796. Thus, while under the

Tenth Amendment "Congress may not command states to administer federal regulatory

programs," Herrera-Inirio, 208 F.3d at 307 and cases cited, pursuant to its spending powers,

Congress may give states the option of complying with such programs and induce them to do so.

See, e.g., Kansas, 214 F.3d at 1202-03 (distinguishing valid "child support enforcement

conditions Congress attached to its social welfare funding program" pursuant to the Spending

Clause from invalid laws under which Congress attempted to require states to enforce a federal

program without giving states a choice).

The Bradley Amendment is a valid exercise of Congress' spending powers authority.

"The relevant case law teaches that Congress has authority of great breadth in its use of the

spending power." CAPRA, 787 F. Supp. at 735 and cases cited.[13] However, the spending power

---

[13] In Oklahoma v. Schweiker, 655 F.2d 401 (D.C. Cir. 1981), where 13 states unsuccess-
fully challenged provisions of the Social Security Act as being violative of the Tenth Amend-
ment, the court held that "[a]lthough there may be some limit to the terms Congress may impose,
we have been unable to cover any instance in which a court has invalidated a funding condition."

is "not unlimited" and the cases recognize several general restrictions. <u>South Dakota</u>, 483 U.S. at 207-08, 107 S. Ct. at 2796. First, "the exercise of the spending power must be in pursuit of 'the general welfare,'" though in "considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress." <u>Id.</u> and cases cited. Second, a condition imposed on the states' receipt of federal funds must be unambiguous, thereby "enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." <u>Id.</u> (citations omitted). Third, conditions of federal grants must be related "to the federal interest in particular national projects or programs." <u>Id.</u> (citations omitted). Finally, "other constitutional provisions may provide an independent bar to the conditional grant of federal funds," meaning that "the power may not be used to induce the States to engage in activities that would themselves be unconstitutional." <u>Id.</u> at 208, 210, 107 S. Ct. at 2796, 2797-98. The Bradley Amendment meets these criteria.

There can be little, if any, question that the protection of children and enforcement of child support laws are intended to serve the general welfare. <u>State of Kansas</u>, 24 F. Supp. 2d at 1194 (PRWORA and requirements designed with the intent "of establishing uniform State tracking procedures," taking strong measures to establish paternity and funding, and ensuring tough child support enforcement" are intended to serve the general welfare) (citations omitted). As the court held in <u>Hodges</u>, 121 F. Supp. 2d at 872-73, upholding the constitutionality of Title IV-D in a challenge by a state unable to meet funding conditions since its computer tracking system was not complete:

---

<u>Id.</u> at 406 and n.9 (collecting cases).

-33-

> When considering whether a spending provision is in the interest of the
> general welfare, the Court "should defer substantially to the judgment of
> Congress." South Dakota, 483 U.S. at 207, 107 S. Ct. at 2793.  Here, the
> Congress made a considered judgment that the American public would
> benefit significantly from the enhanced enforcement of child support
> decrees and the diminution of the number of parents who are able to avoid
> their obligations simply by moving across local or state lines.  The mere
> fact that this Congressional policy may result in some hardship to certain
> citizens is not sufficient to undermine the assessment by Congress that the
> measure enhances the "general welfare."

Id. at 873.  Similarly in the instant case, even accepting as true plaintiffs' assertion that they

"stand ready to offer evidence that the Bradley Amendment as it is applied, forces a significant

portion of the population into the underground economy by preventing them from ever achieving

financial stability" (Pls' Opp. at 8), such facts are still insufficient to negate the conclusion that

"child support regulations are within the 'pursuit of the general welfare.'"  CAPRA, 787 F. Supp.

at 735.

There is no question that the Bradley Amendment is sufficiently unambiguous so that the

states are aware of the consequences of their participation, and the second criteria under the

Spending Clause has been met.  The third criteria, requiring a nexus between the conditions and

the federal interest, has also been satisfied.  See CAPRA, 787 F. Supp. at 735 ("the federal grants

of money are related to the federal interest in child support").

The Bradley Amendment "is not intended to prevent changes in future child support

payments if the financial situation of the noncustodial parent changes.  What the Committee is

seeking to prevent is the purposeful noncompliance by the noncustodial parent, because of his

hope that his child support obligation will be retroactively forgiven."  S. Rep. No. 99-348, at 155.

Thus, the conditions imposed by the Bradley Amendment are clearly related to the federal goals

-34-

of reducing the incidence of poverty among children and families. Hodges, 121 F. Supp. 2d at 874.

Plaintiffs argue that the Bradley Amendment is not sufficiently related to a federal interest in "national projects or programs" because there "is no history of federal interest in domestic relations matters . . . ." (Pls.' Opp. at 8). However, as the above-cited cases make clear, the financial support of children is sufficiently related to the "general welfare" to be of federal concern under the Spending Clause. "[T]he Title IV-D conditions pertain to the funding of public assistance and the policing of the interstate travel and commercial activities of delinquent parents. Even though the federal government looks to the states for significant cooperation in these matters, these are domains that are comfortably within the power and expertise of the federal government." Hodges, 121 F. Supp. 2d at 877. See also CAPRA, 787 F. Supp. at 727 ("federal and state laws mesh together in the area of child support").

The final criteria under the Spending Clause is easily satisfied as well. States which adopt the non-modification provisions required by the Bradley Amendment would not be engaging in unconstitutional conduct such as "invidiously discriminatory state action or the infliction of cruel and unusual publishment." South Dakota, 483 U.S. at 210-11, 107 S. Ct. at 2798.

One final point should be addressed under the spending powers analysis. The cases "have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" Id. at 211, 107 S. Ct. at 2798 (citation omitted). However, no such coercion can be found in the instant case. "Like other federal-state cooperative programs, the Act [Title IV-D] is voluntary and the States are given the

choice of complying with the conditions or forgoing the benefits of federal funding." Pennhurst

State Sch. & Hosp. v. Halderman, 451 U.S. 1, 11, 101 S. Ct. 1531, 1536-37, 67 L. Ed. 2d 694

(1981).  The fact that the loss of federal funds would have substantial impact on a state's ability

to provide for its needy does not create a "coercive" situation so as to declare a funding condition

unconstitutional.  See, e.g., Oklahoma, 655 F.2d at 413-14 (even though effect of loss of

Medicaid funds would be "drastic," condition that state maintain certain levels of payments to the

SSI program is not so coercive as to violate Tenth Amendment); West Virginia v. U.S. Dep't of

Health & Human Servs., 132 F. Supp. 2d 437, 443-44 (S.D. W. Va. 2001), and cases cited

(review of cases establishes that "no court has invalidated a funding condition as being

impermissibly coercive"; here potential loss of Medicaid funds, while devastating, does not make

compliance with program compulsive and violative of Tenth Amendment).  In sum, the "Title

IV-D provisions withstand scrutiny and are constitutionally valid under the Spending Clause and

the Tenth Amendment." Hodges, 121 F. Supp. 2d at 877.  The government's motion to dismiss

Count II of the amended complaint should be allowed.

### 3.  **Equal Protection of Law**

In Count III, plaintiffs allege that the Bradley Amendment has a disproportionate impact

on men.  Alleging that ninety percent of custody awards benefit women, the plaintiffs' theory is

that men disproportionately "suffer damages as a result of the harsh and arbitrary enforcement of

the Bradley Amendment." (See Compl. at ¶¶ 63-64).  "An equal protection claim is found only

upon a showing of 'gross abuse of power, invidious discrimination, or fundamentally unfair

procedures' or some sort of unjustified disparate treatment with respect to similarly situated

applicants." Collins v. Nuzzo, 244 F.3d 246, 251 (1st Cir. 2001) (citations omitted). Plaintiffs

have not met this standard, and Count III should be dismissed.

The Bradley Amendment, on its face, is gender-neutral and applies equally to men and

women who are in arrears on their child-support obligations. The standard of review for such

regulations faced with equal protection challenges is well established. Thus,

> When a statute gender-neutral on its face is challenged on the ground that
> its effects upon [men] are disproportionably adverse, a twofold inquiry is
> thus appropriate. The first question is whether the statutory classification
> is indeed neutral in the sense that it is not gender based .... [T]he second
> question is whether the adverse effect reflects invidious gender-based
> discrimination. In this second inquiry, impact provides an "important
> starting point" but purposeful discrimination is 'the condition that offends
> that Constitution.'

Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 274, 99 S. Ct. 2282, 2293, 60 L. Ed. 2d 870

(1979) (citations omitted). "Discriminatory purpose . . . implies that the decisionmaker . . .

selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in

spite of,' its adverse effects upon an identifiable group." Id. at 279, 99 S. Ct. at 2296 (citations

omitted). Accord Hayden v. Grayson, 134 F.3d 449, 453 (1st Cir.), cert. denied 524 U.S. 953,

118 S.Ct. 2370, 141 L. Ed. 2d 738 (1998) ("The burden is an onerous one . . . .").

Under the first part of the Feeney analysis, it is clear that the Bradley Amendment is not

gender based since it applies to all non-custodial parents, regardless of their sex. Moreover,

plaintiffs have not demonstrated that the classification of "obligee" or "obligor" is actually a

classification which "by design is covertly gender-based." Austin v. Berryman, 955 F.2d 223,

226 (4th Cir. 1992) (reference to "spouse" in unemployment statute is not "covertly gender-

based" despite disparate impact on women). There is an "economic justification" for the statute

which bears no relationship to gender. See id. The Bradley Amendment is intended to assist in the collection of child support payments. It is irrelevant to the goal of providing for needy children whether the payments come from men or women.

Under the second part of the Feeney analysis, the plaintiffs fail to allege any facts from which this court could infer that the true motivation behind the Bradley Amendment is "invidious gender based discrimination." "Improper motive" cannot be conclusively alleged, but must be supported by *"specific, nonconclusory factual* allegations giving rise to an inference of . . . discriminatory intent." Judge v. City of Lowell, 160 F.3d 67, 75 (1st Cir. 1998). See also Barrington Cove, 246 F.3d at 10 ("An equal protection claimant 'may not prevail [against a Rule 12(b)(6) motion] simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by discriminatory animus.'") (citation omitted); Hibbard v. Benjamin, No. 90-10361-WF, 1992 WL 300838, at *6 (D. Mass. Sept. 21, 1992) (dismissing gender based equal protection claim in relation to child support calculation guidelines where plaintiff-fathers failed to allege facts sufficient to show discriminatory intent or a disparate impact on the alleged class of fathers). Thus, the plaintiffs' equal protection claim must fail since there is no evidence of invidious discrimination.

"A statute that neither abridges a fundamental right nor operates against a suspect class receives rational basis review when it is challenged under the Equal Protection Clause." Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 660 (1st Cir. 1997) cert. denied 524 U.S. 951, 118 S.Ct. 2366, 141 L. Ed. 2d 735 (1998); Austin, 955 F.2d at 228 ("because we have determined that the classification at issue is not gender-based, we apply the rational relationship test"), and

cases cited.[14]  As previously discussed, the Bradley Amendment is rationally related to the

legitimate state interest of child support enforcement.  Accordingly, the plaintiffs have failed to

state a claim under the equal protection clause.  Thus, this court recommends dismissal of this

claim.

### 4.  Ninth Amendment

The plaintiffs' final claim is that both the Bradley Amendment and the passport

provisions violate their "natural rights" pursuant to the Ninth Amendment.  See Compl. Count

IV, ¶¶ 66-70.  This count, too, fails to state a claim upon which relief can be granted.

The Ninth Amendment provides that "the enumeration in the Constitution of certain

rights shall not be construed to deny or disparage others retained by the people."  U.S. Const.,

Amend. IX.  The Ninth Amendment "does not confer substantive rights beyond those conferred

by governing law."  Vega-Rodriguez v. Puerto Rico Tele. Co., 110 F.3d 174, 182 (1st Cir. 1997).

"The Ninth Amendment is a rule of interpretation, rather than a source of rights."  Froehlich v.

State of Wis., Dept. of Corrections, 196 F.3d 800, 801 (7th Cir. 1999), and cases cited.  Its

purpose was to make it clear that the enumeration of specific rights in the Bill of Rights was not

intended to deny the existence of unenumerated rights.  Id. and cases cited.  Because the

---

[14]  In the plaintiffs' opposition to the motion to dismiss, the plaintiffs urge the court to apply an "intermediate-level" of scrutiny in the equal protection analysis.  See United States v. Virginia, 518 U.S. 515, 532-33, 116 S. Ct. 2264, 2275, 135 L. Ed. 2d 735 (1996) (for gender based classifications, the government must demonstrate that the classification serves an important government interest and is substantially related to the achievement of that interest).  However, because the plaintiffs have failed to establish that the Bradley Amendment is gender-based, this standard of heightened scrutiny does not apply.  Austin, 955 F.2d at 228.  This court is equally confident, however, that should such heightened scrutiny apply, the statute would likely survive the challenge.

plaintiffs cannot derive any rights, including "natural rights" from the Ninth Amendment, this claim should be dismissed.

## CONCLUSION

For all the reasons stated herein, this court recommends that the Defendants' Motion to Dismiss (Docket #9) be ALLOWED.[15]


_Judith Gail Dein_
Judith Gail Dein
United States Magistrate Judge

---

[15]   The parties are hereby advised that under the provisions of Rule 72, Fed. R. Civ. P., any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4-5 (1st Cir. 1998).